Thank you, Judge Christin. And may it please the Court, my name is Mark Caldwell. I'm here to represent Ms. Sammons this morning in this Social Security Disability Appeal. I realize I am in charge of keeping track of my own time, but I just would like to let the Court know that I would like to try to reserve three to five minutes if possible, depending on how many questions I get. This case involves several issues, but I would like to proceed to what I believe is the most substantive issue in this case, and that is the assessments of the examining psychologist, Dr. Rabara, who the agency sent the claimant to, and the psychiatrist who was treating Ms. Sammons at Southwest Behavioral Health. In both of those instances, the administrative law judge rejected the examining and treating physicians' assessments as well as the claimant's symptom testimony. And in all three of those instances, meaning Dr. Rabara, Dr. Perry, or the claimant's symptom testimony, the vocational experts said a person with those limitations can't sustain work. But little weight was given to Dr. Rabara's opinion, because Dr. Rabara's notes included statements that were contradictory. I just want to have an opportunity for you to respond. The records indicate that she had no problems and reported being a, quote, social butterfly. What about that? Why isn't that adequate reason to give the opinion of Dr. Rabara less weight? I didn't see that as the reason in the ALJ decision, although she mentioned it peripherally. But I did find it interesting in Dr. Perry's treatment notes, she said, and I'm quoting at 459, she's trying to remain an upbeat presentation, as is her way. Another note at ER. But it was Rabara who had the social butterfly comment in the notes, right, not Perry? You just jumped to Perry, am I right? Yes, that wasn't what I meant to do. I wasn't trying to change the subject. I was trying to say that there's other notations in the record that, quite frankly, this woman is and she's tearful. And at other times, she's saying, boy, life is looking up and things are looking, I'm really looking forward to this or that or the other thing. But counsel, if you've got what I'll say is different or inconsistent comments in this record, one supportive of your position, one supportive of what the ALJ found here, we can't re-weigh that evidence, right? The court is not here to re-weigh the evidence. I will grant that, but I'm not going to agree with you. In terms of substantial evidence in the record to support what the Secretary has done here, if the ALJ gives sway to credibility choices, inconsistent findings, that seems to carry a lot of weight to support their position, the Secretary's position. Let me come back and respectfully disagree with your underlying premise. And the underlying premise is that different statements at different times by a mentally ill person about how she is presenting herself are necessarily inconsistent. But isn't that what the experts have to rely upon, too? Well. They don't just get an opinion out of the blue. They've got to talk to the patient. They do. But let's go back and look at Dr. Rabara's report, for example, okay? Dr. Rabara didn't just talk to this woman and say, well, here's what she told me and therefore I'm going to put down something different. He didn't do that. He administered psychological testing. He did the WACE, he did the Bender, all of those other tests. Now, if he had just spoken to Ms. Sammons and had done nothing more, that might be a stronger point of view. But that isn't what happened here. He didn't just speak to her and then say, well, here's my opinion. And the ALJ and, frankly, the District Court as well seem to have simply glossed over the fact. Going back to your original opinion on what your two strongest points are, including Rabara, isn't Perry your stronger argument? I'm sorry, again? The treatment by the ALJ of Dr. Perry's assessment. Isn't that your strongest argument? Is it a strong argument for me? For you. You bet. The strongest, though. I think you have a stronger argument than you even made about Shinkinwala. I don't know how to say that doctor's name. But it seemed that the ALJ thought that there had never been a fibromyalgia assessment with the trigger points. And I think at ER 377, that Dr. Shinkinwala does that medical test and finds 14 out of 18 fibromyalgia points. Well, what the ALJ's mistake was here is a mistake of both law and fact. Notice, by the way, that she went to the telephonic medical expert first without taking a single word of the claimant's symptom testimony. But this is a specific and important question, because the ALJ was concerned that your client made the representation about this type of testing being completed and thought there was no indication in the record that it had been completed, since there's an adverse credibility finding this is problematic for you. And so do you want to go to Judge Friedland's question? I think Judge Friedland is right about there was the testing. But let me just, certainly not arguing with the fact that helps my case, go further and say this Court just recently in the Rounds case, and excuse me, it was decided May 7th, recognized that the trigger point testing is not necessary for a finding of fibromyalgia. But you don't even need to say that, because you have the trigger point testing. Point. That's my point. I've got it. The discrepancy about whether it was done. I'm sorry, Judge Christin, I didn't mean to interrupt. Well, I think I interrupted you. Our point was just that the record to us seems to support your client's statement that that type of testing was done. It doesn't matter about the efficacy of the testing or the results of the testing. It's just that the ALJ was concerned that she had, I don't think it's too strong to say that she had perhaps represented that that had happened and that the record was inconsistent with that having taken place. And I don't think that's the case. We are in agreement. I'm sorry? We are in agreement. Well, we might not be completely in agreement, Counsel, but I think maybe on that point, what is the ramification of that? There's still an adverse credibility finding here. Well, the adverse credibility finding was limited to three things. One, and I'm going to quote this directly because the language is important, at 419, I need to get on disability so I can heal. The implication is somehow that she was going to get treatment so that she could make up a case so that she could present a disability claim, and that's just simply not true. And I cite in my Rule 28J letter a case I came across recently in the Seventh Circuit, admittedly, but it's a dare and it addresses that issue. The other reason was the ALJ said, well, she gave vague testimony, and the vague testimony was she was asked about gripping by her counsel, and he said, do you have trouble gripping? And she said, yes. Next question. The ALJ had every opportunity in the world, if the ALJ doubted whether that was true, to say, what do you mean? Are you talking about weakness? Are you talking about arthritis? Whatever. The woman simply answered yes or no to a yes or no question. Those are all shades of gray kinds of issues. Again, your minutes are ticking away. Could you go to the hard one, please? The hard one is the representation about her prior work. Okay. I agree. That's the hard one. And I'm going to do something that may surprise you. Let's assume she was lying about that. Okay. I have to help you again, I think. Again? Because I don't think your record is as bad as you think. As I read it, at ER 461, she had an additional phone job, meaning there were two, it seems to me. And so one of them might have been only for half an hour or half a night at $18 an hour, and the other one could have been for months. It seems to me she had two jobs, and you're sort of ready to concede that she only had one, that she was lying. I'm not— No. Am I going to presume that you're saying that because what you answered earlier, that if she's mentally ill, you would expect these inconsistencies? The inconsistencies you were talking about, but we're talking about a different subject, so let me not stray from that. So you're saying that she may have lied because it was embarrassing, or is that your point? Precisely. Precisely. She said, my mother is in the room. I'm so embarrassed. It only lasted for half a day. I just couldn't do it anymore. Now, Judge Friedland may well be correct that there's more than one telephone job, or the ALJ's supposition that she was not telling the truth may be another interpretation. By the way, I want to make clear that I was not conceding the point I said, hypothetically, let's assume it. But that would still be a misstatement, counsel, if she said, you know, whether she has one job or two jobs. Isn't the clear implication that she said, gee, I just couldn't go through with it, just couldn't do that type of work? Should we even be concerned with the motivations for the inconsistencies? Well, let me answer one question at a time, please. Sorry. The one job that we're talking about is the own sex operator job. Okay. There's the other possible job that Judge Friedland mentioned. But the important point I want to make is, and I'm keeping an eye on that clock, the important point I want to make is that if we even assume an inconsistency that may not exist, this court has made it extremely clear in the Brown-Hunter case decided just last month, and in the Brugerell case decided last year, both of which were in my Rule 28A letter, that there has to be a clear connection between what evidence the ALJ relied upon and what evidence the ALJ is saying is not credible. And I cannot for the life of me imagine what the connection can possibly be between the severity of this woman's physical and mental problems and the fact that maybe she fudged about the phone sex job while her mother was in the room. Well, I think I would take issue with that, Counsel, because the difficulty, she's got this generalized pain syndrome diagnosis and then a mental health diagnosis. She's arguing that both of those were her severe limitations. And so they're both, by their nature, going to be very heavily dependent upon her own reports, right? Yes, I think they're interconnected. I think anybody who went through this horrific series of surgeries would have mental health problems. Well, so to your point, if you can just circle back to the point then, you've explained why you think that the credibility determination is not well supported. But you were making, and I appreciate that argument, but you're making a different point now, which had to do with the connection, the relatedness about the credibility finding and the illnesses. And my point is just that given the types of maladies that she's claiming, it seems to me to be a pretty close connection. Connection between? The credibility finding is very critical in this particular type of a case because the nature of her illnesses are such that, or the nature of her disability is such that there isn't going to be an x-ray. There isn't going to be an objective finding. Correct. But there are objective tests that Dr. Ibarra conducted, and that seems to be something that the ALJ simply overlooked. What about fibromyalgia? Are these trigger point tests objective? I don't quite know how they work. The agency recognizes that they are, and this isn't in the briefing, so if I get my hand slapped for citing some authority, please forgive me. But there is a ruling, ruling 12-2P, that the agency has issued regarding fibromyalgia that specifically says that's evidence you can rely upon for that determination. But in this case, are you saying that there was a diagnosis of fibromyalgia? Yes, doctor. He cites his name, Burnham, so let's use that because it's a lot easier to pronounce. Forgive me, I can't. Dr. Burnham is the guy with the long name that starts with a C that none of us can pronounce. A koala or something like that. You're good. Yes, he definitely diagnosed fibromyalgia. He tested for it, and is that what you're putting into the rubric of generalized pain syndrome? I think putting into is the right way to put it, because it's not exclusively the fibromyalgia. I also think it's, in my personal opinion, more related to the residuals of all of these surgeries this woman has endured. But the point is that even Dr. Young, who was the agency's own consultative examiner, diagnosed the chronic pain syndrome. And the one thing that also has been ignored about Dr. Young's report is that yes, he gave certain strength limitations, but in his report at 293, he said she would need to take frequent breaks. So one more thing that has been ignored when looking at this case. I know that I'm down to 50 seconds, and a rebuttal in 50 seconds is almost impossible. If the court might consider giving me some extra time, I'd appreciate it. How about if we hear from opposing counsel? Thank you. Thank you, counsel. Good morning. Catherine Bostrick, representing the commissioner. In this case, as you pointed out, the ALJ found that her testimony regarding her mental and physical limitations was unbelievable based on her dishonesty at the hearing. And every doctor who examined or treated her agreed that she remained capable of carrying out simple instructions or performing routine tasks, which is what the ALJ limited her to. Also, the examining and reviewing physicians agreed that she remained physically capable of at least light work. Some of them found medium work, although the ALJ gave her the benefit of the doubt and limited her to an extremely restricted range of light work. If you could, this is really echoey for us. Sorry. Can you speak a little more slowly? Sure. Speaking louder doesn't help us. In fact, it makes it a little worse. But if you could speak slowly, it'd help. Sure. Okay. So I want to talk about credibility first. As you point out, it's really crucial in this case because so much of what she's relying on is subjective. The most critical to the ALJ here was her dishonesty at the hearing. She was under oath. Regardless of whether her mom was there, regardless of whether she was embarrassed, the fact is she lied under oath regarding her work history. She testified that her job as a adult entertainment phone worker only lasted for half an hour because she couldn't do it for moral reasons. But wasn't the question specifically about the $18 an hour job?  Honestly? I don't think so. I think if you look at the record, it's clear that there was several jobs going on for long periods of time. I'm not sure if the question was that limited. In September 2009, she said she was an adult entertainment phone worker part-time, which had been going on for a couple of months. That's at 438. A few days later, she again stated that she was working part-time and was making 45 cents an hour. That's at 456. In October 2009, she said she was working for a telephone talk company, and at the end of October, like you said, she said that she had found an additional phone call job and was going to be earning $18 an hour. But what about the argument? I think I read the record the same way you do. I think it was pretty clear that it was ongoing, whatever this telephone job was. But what about the argument that she was embarrassed or ashamed? Again, she was under oath. I'm sometimes embarrassed about the things that you have to say in cases, but you're under oath. You can't be dishonest when you're testifying before a judge. The ALJ reasonably found that her ability to be dishonest at the hearing reflected poorly on her ability to testify regarding what her actual mental limitations are, and that's well recognized in the case law that if . . . Yes, but it's not a disqualifier. That's not your argument that because she was found to have an adverse credibility determination, particularly supported as it is, that she's somehow disqualified? No, just that it was one very valid reason for the ALJ to say, look, you were willing to be dishonest to me. What else are you being dishonest about? So I think the testimony that the dishonesty about the phone job refers to is at ER 505, the question was, you were making $18 an hour. Could you tell me about that? And she says, I never made $18 an hour. I thought I couldn't do it. My mom's here, et cetera. And then she says it was just half an hour. The question was the $18 an hour job. So isn't it possible if, as you just said, she had more than one job, she was responding to this one job that was referenced at one point and maybe wasn't dishonest at all? I mean, I think that's one way to look at the evidence. But again, here it's, you know, that was one way, but the ALJ ultimately looked at it a different way, and that was a reasonable way in that she, he asked her about her work, regardless if it was, you know, he did ask specifically about the, or she asked specifically about the $18 an hour, but she was asking about her work history in general. And Sammons didn't say, well, you know, maybe I wasn't, I couldn't do the $18 job, $18 an hour job, but I was doing other jobs. You know, I did work in this industry for a little bit or for months, as she told her doctor. So there's two ways to weigh that evidence. And the question here is, was it reasonable for the ALJ to find that she was dishonest? So what, what should we do if we think that one maybe is debatable about what was going on, but that some of the other reasons the ALJ gave, like it's vague to say yes to a question that's a yes or no question. I mean, if we don't think that's vague, what do we do if we think really the other reasons the ALJ gave are no good and this one is debatable? The ALJ also gave other reasons. For instance, the ALJ noted that her complaints of disabling physical limitations and pain were out of proportion to the medical evidence. Let's look at her testimony. She testified that she was very limited. She testified she could sit for 20 minutes, stand for five minutes, walk for 15 to 20 minutes and lift only eight pounds due to neck and back pain and pain from her surgery. But let's look at the objectively normal findings. Two weeks after her most recent surgery, her surgeon noted she was doing extremely well. She never complained of phantom pain or any pain due to reconstructive surgery after that date. With regard to her neck and back pain, Dr. Winkler, the medical expert who reviewed the looked at her x-rays, which showed only mild to moderate degenerative changes. And he testified that Sammons could perform a light range of work. But fibromyalgia doesn't show up on an x-ray, is that right? Fibromyalgia is just diagnosed based on trigger points. So there is a one-time evaluation from the treating rheumatologist in which he does find 14 out of 18 trigger points. But, you know. The x-rays you're speaking of are her back x-rays. Sorry, yes. The x-rays, she had lower back and neck x-rays, all of which showed, you know, only mild to moderate degenerative changes. So it seems like the ALJ assumed there was no basis for a diagnosis of fibromyalgia in this record. And if we think that's not true, that changes things, doesn't it? I think, you know, that was at step two. So what's really important here is not what the ALJ found was severe at step two, because the ALJ didn't stop at step two. The ALJ went on, found some severe impairments, and then went on to consider, I'm sorry, I keep saying he, she, went on to consider the combined effect of all the impairments. Let's keep in mind the ALJ limited her to a very restricted range of light work. Except, right. So the vocational expert, though, said that if she had fibromyalgia, or sorry, let me back up to the medical expert. So the medical expert at ER 503 says if she has fibromyalgia, then she can only lift five to frequently ten pounds occasionally, and can stand or walk for no more than two hours a day. That is consistent with sedentary work, not light work, right? So your argument about harmlessness doesn't make sense to me. So the medical expert testified that she couldn't, or he couldn't determine whether there was going to be, whether there was a fully supportive diagnosis. Right, but if we think that was a mistake, and there was, because we can find it, then shouldn't she be sedentary work instead of light work? Well, I think if you, if we look at the whole record, any diagnosis of generalized pain syndrome or fibromyalgia is not well supported. Just because Dr. Chinni Kanwala had a one-time trigger point examination showing 14 out of 18 points, there's just no, not really any other evidence showing that she had it. In October 2009, her lab tests were negative overall, except for one positive rheumatoid factor. She had no signs of active synovitis, no inflammation in her joints. In November 2009, he did another workup, which was extensive, and it was negative. Maybe this means we need to remand for the ALJ to take another look at this. But if the ALJ's reasons that were given are wrong, we have to only affirm on the reasons given by the ALJ, right? We can't just post-talk, come up with other rationalizations. Again, I think because, you know, in cases where the court has found error at step two, the court has also found that this can be harmless because the ALJ goes on in other steps, assesses a residual functional capacity that takes into consideration all of these impairments, severe or no. Counsel, if I interpret this record to indicate that the appellant here has both physical and mental issues, isn't the issue really whether or not there's substantial evidence to support the ALJ's position that with those problems, that whether she could perform work, whether it's work in the national economy, sedentary, medium or whatever, isn't that really the issue here? And whether or not the combination of those mental and physical ailments precludes her from having such employment? Yes, that's exactly right. And that's, you know, that's what happened here. So in that regard, given the combination of factors here, she has physical and mental issues. The question is her employability with those issues. And the ALJ, you know, fully accounted for all of those, found that she could do a restricted range of light work with a mental limitation that would account for generalized pain syndrome or fibromyalgia. I've not, you know, I've seen a number of Social Security appeals over my lifetime here, but I've never seen one like here where the ALJ is discounting the opinions of the treating physician and the consulting or examining physician, Rabara and Perry. It seems unusual to me. It definitely happens. You know, it happens in cases like this where the opinions are just not consistent with the record, are not supported by the record. Both of these doctors, you know, found certain limitations that were just not supported. Dr. Perry found that she had a marked limitation in responding appropriately to work pressures. But her treatment notes demonstrated that her mental health improved significantly over time. But she offered that- Is it just a- I'm sorry. Didn't Dr. Perry make a mistake in that? So he said that, sorry, didn't the ALJ make a mistake about Dr. Perry? Because the ALJ said that Dr. Perry's marked diagnosis was difficult to reconcile with the previous assessment. And then that assessment that was cited was actually something that hadn't even happened yet at the time, Dr. Perry. It's out of chronological order. It's out of chronological order. The problem the ALJ had was that the ALJ understood that Dr. Perry had said first that there was improvement and second that there was marked impairment. And in fact, Dr. Perry's written chronological order said it the other way around. Well, I think if you look at it, you know, the treatment notes over time show she denied depression and anxiety. Dr. Perry discontinued her antidepressant medication in November 2009. In December 2009, she was alert and oriented and she was improved on her own. And on the same day that Dr. Perry authored the opinion, she also noted that Sammons was, quote, doing better, was much more animated and was in better spirits and was getting her life together. So is the ALJ saying, is the ALJ saying that, really saying, and it's in this record that, well, maybe the reason why these doctors are saying that is because they had some sympathy factor on his page? What rational basis? I think the ALJ did note that, you know, if someone has a long treatment history, that they can be sympathetic. But I think most important was the ALJ found that the notes were inconsistent with the record, which they are. So is that his explanation? Sympathy for the inconsistency? That's one reason the ALJ gave, but not the only reason. The ALJ also noted that they were inconsistent and they weren't fully supported by Dr. Perry's treatment notes. So I'd like to give you a chance to explain this because I thought that the first time that the improvement is reflected in Dr. Perry's notes is at ER 465 on December 1st, 2009. But you're saying that there was such an indication before the October 26th, 2009 time when he said there was the marked diagnosis? Can you point me to where it said earlier than October 26th, 2009 that she'd already had improvement in Dr. Perry's notes? I'm sorry, where are you? So I can find the improvement in Dr. Perry's notes after the original marked diagnosis, but not before. So the ALJ gave little weight to Dr. Perry's December 2009 assessment. So that's the one I'm talking about. I'm sorry.  Let me look at Dr. Perry's notes. I think it's at ER 475 in October. So there's an October, there's a supplemental questionnaire, and then Dr. Perry has another. The ALJ is talking about Dr. Perry's December 2009 assessment. Do you know, oh, let's see. Where is the marked, can you point me to the page in that assessment where the marked diagnosis happens that the ALJ was referring to? I'm sorry, I don't have that. I only have the October, I only have the October 2009. Because that's, I know where he said marked. I don't, I'm not sure it appears in the December. So I'm not sure what you're saying about what the ALJ meant makes sense, but I'm not positive. You said December, counsel, but at ER 464, it says that Dr. Perry spoke with Sammons, for instance, on November 23rd, only a week before the improved assessment, indicates that Sammons remained depressed. Of course, that's... Right. And I guess, I'm not sure about that. I would have to look at it. But I think the point remains of, you know, regardless of when it happened, it was inconsistent with the record as a whole. The record as a whole showed that she was improving. The record as a whole, you know, she denied depression after October 2009. She's just discontinued her antidepressant medications. But that's not unusual, right? Don't we have instances even like this, and perhaps where one improves, one reverts back, depending upon the conditions in which they're suffering? Not, maybe not. That's, again, you know, one way to interpret the evidence. The ALJ here interpreted the evidence another way in that, you know, she wasn't taking antidepressants. She was denying depression. She was denying anxiety. She was able to work part-time for over, you know, several months, at least. We know that much. Quickly, I just want to say, in the event that the court finds error, which, the proper remedy here is for remand, not for payment of benefits. In Tricolor, the court clarified that a ward of benefits should only be granted in very narrow circumstances. In Burrell and in Garrison, the court talked about whether there's serious doubt regarding disability. I would argue that there is definitely serious doubt here, considering that she was able to work part-time. She had normal range of motion in her spine and in all of her extremities. Her psychological symptoms improved dramatically. She did not require antidepressant medications, and she often denied symptoms of depression and anxiety. So, I'd ask that the court affirm the commissioner. Thank you. Thank you, counsel. Counsel, we'll put two minutes on the clock for you. Thank you for that. I'd like to help with the citations to the record, because I think everybody was struggling with that a little bit. At ER 461, on October 26, 2009, Dr. Perry makes the statement, she was more animated, and she was improving as the situation improves. On the very same date at ER 505, Dr. Perry says she would have marked limitations adjusting to work pressures, and that's the point. These are two separate settings. Improvement in a work setting, excuse me, an improvement in a treatment setting is not a predictor of ability to withstand the rigors of the workplace. And that's exactly what Dr. Perry was recognizing when she completed the assessment form. So, I think that is an extremely important point to make. Counsel, before you leave it, I've just been itching to ask this question about Dr. Hurley. Your brief talks about Dr. Hurley. Do you mean Dr. Hayes, or where does this come from? No, so the person who was writing the brief had to be using voice recognition. He meant Dr. Perry. Hurley, Perry. There's no Dr. Hurley in this case. There's a Dr. Hayes, which is a state medical consultant. He wasn't talking about Dr. Hayes. He was talking about Dr. Perry. Just an error, okay. It's just a voice recognition error. All right. So, the best case on the point I was just making is Garrison 759F3, 995. I would like to address the, do I have 21, 20 seconds left on my two minutes? Okay. In that case, I'm going to use that to very strongly urge, per the Garrison case, that this court remand for payment of benefits based upon the improperly discredited evidence. The last point I want to make is it is a mistake, I believe, with all due respect, to continue to refer to this remedy as rare. There is no quota. If 10 cases come before this court that should be remanded for payment of benefits, then 10 cases should be remanded for payment of benefits. If 10 cases come before you that should be remanded for further proceedings, then 10 should be remanded for further proceedings. Thank you. Thank you, counsel. Thank you both for your arguments today. They're very helpful.
judges: Lemelle, Christen, Friedland